COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Elder and Annunziata
Argued at Richmond, Virginia


DEVIN MICHAEL COFFEY, AN INFANT,
 BY DANIELLE MARIE TRIVETTE COFFEY,
 HIS MOTHER AND NEXT FRIEND
                                        OPINION BY
v.   Record No. 0529-01-4         JUDGE JERE M. H. WILLIS, JR.
                                        JANUARY 29, 2002
VIRGINIA BIRTH-RELATED NEUROLOGICAL
 INJURY COMPENSATION PROGRAM


           FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

                Ann LaCroix Jones (William O. Snead, III;
                Gary B. Mims; Mark A. Towery; Snead & Mims,
                on briefs), for appellant.

                John J. Beall, Jr., Senior Assistant Attorney
                General (Randolph A. Beales, Sr., Acting
                Attorney General; Richard L. Walton, Jr.,
                Senior Assistant Attorney General, on brief),
                for appellee.


     On appeal from a decision of the Workers' Compensation

Commission denying him benefits under the Birth-Related

Neurological Injury Compensation Act, Code § 38.2-5000, et seq.,

Devin Michael Coffey, an infant, who sues by Danielle Marie

Trivette Coffey, his mother and next friend, contends (1) that

the commission erred in assuming jurisdiction and deciding his

claim without affording him legal counsel; and (2) that the

commission erred in holding that the Birth-Related Neurological

Compensation Program (the Program) had successfully rebutted the

presumption set forth in Code § 38.2-5008(A)(1).  We affirm in part, reverse in part, and remand.

## I.   BACKGROUND

Danielle Marie Trivette Coffey gave birth to Devin following a forty-one to forty-two week pregnancy.  The pregnancy was marked by increasing signs of pregnancy induced hypertension (preeclampsia).  The labor involved slow cervical dilation and increasing signs of preeclampsia in the mother, including swelling, muscle spasms, and increased blood pressure. Fetal heart tracings ranging from seventy to one-hundred-eighty beats per minute and light meconium stained amniotic fluid indicated a distressed infant.  The delivery was complicated by the child's large size and the mother's small stature.  Two attempted forceps deliveries failed.  A fourth-degree episiotomy was performed.  The child was finally delivered after application of forceps to his head.

At one minute of life, Devin's APGAR score was two out of a possible ten.  He was not breathing.  His body was limp.  He made no sounds.  He gave no response to stimuli.  His color was blue to pale.  He was resuscitated with stimulation and his airways were suctioned.  He received oxygen by mask and endotracheal tube.

At two minutes of life, Devin's arterial chord blood gases were critically low.  They remained low for almost two hours

after his birth.  He had notable molding of the head with bruising, edema and abrasions.

For three hours following birth, Devin displayed audible respiratory grunting with nasal flaring and blueness and coldness of the extremities.  He had difficulty feeding and had to be fed.  He displayed increased oral secretions and a slight decrease in tone in his right arm.

Devin was discharged on his third day of life, only to be rushed back to the hospital the same evening for breathing difficulty with gagging and choking.  His color changed to red and blue, and he had mucus in his nose and throat.  He was examined and discharged.  Over the course of the next two months, he continued to experience difficulty with secretions, gagging and choking for no apparent reason.  He would curl up, jerk, and then relax.

On March 28, 1993, Devin was seen in the emergency room for sleeping excessively without waking to eat, not crying, and generally feeling limp.  Four days later, he was rushed to the emergency room where he demonstrated jerking motions and apnea spells.  At this point, he was diagnosed with a seizure disorder and infantile spasms, confirmed by EEG testing.

When Devin was four months old, his mother moved with him to Nebraska, where his care was assumed by staff at Creighton University Medical Center.  His records from that institution describe seizures ranging from simple staring episodes to full

- 3 -

flexor spasms with back arching, excessive salivation and choking.

Devin has undergone numerous tests to determine the cause of his condition. A workup for sepsis was unremarkable. A differential diagnosis of tuberous sclerosis suggested by an early MRI of the brain was ruled out by a follow-up EKG. Long chain fatty acid and metabolic studies failed to demonstrate metabolic disorder. Testing of diminished deep tendon reflexes demonstrated no specific etiology. He displayed no progressive decline in cognitive function. Perinatal asphyxia could not be ruled out.

Devin is now seven years old. He is profoundly retarded, quadriplegic, and cannot speak. His condition renders him permanently in need of assistance in all activities of daily living.

## II. LEGAL ASSISTANCE

Code § 38.2-5009 directs the commission to enter an award in favor of an infant determined by it to have sustained a birth-related neurological injury, see Code § 38.2-5001, resulting from obstetrical services delivered by a participating physician or rendered in a participating hospital.

Code § 38.2-5001 defines a claimant under the Act as:

> [A]ny person who files a claim . . . for a
> birth-related neurological injury to an
> infant. Such claims may be filed by any
> legal representative on behalf of an injured
> infant . . . .

- 4 -

Thus, a claim may be filed by the infant or on his behalf by his legal representative. Code § 38.2-5004 sets forth the requirements for filing a claim under the Act.

On March 1, 2000, Danielle Marie Trivette Coffey filed in the commission on Devin's behalf a petition setting forth the information required by Code § 38.2-5004. She did so as his mother. She is not a licensed attorney-at-law and has no professional legal training. She noted on the petition that Devin had "no legal representation." The claim proceeded through the commission with no legal representation on Devin's behalf, with Ms. Coffey acting as his next friend. On appeal, Devin argues (1) that the commission should have appointed legal counsel to represent him in the prosecution of his claim or a guardian ad litem to defend his interests, and (2) that by failing to ensure that he had legal representation in the prosecution of his claim, the commission denied him due process. These positions were not asserted before the commission. See Rule 5A:18. However, Devin contends that the failure to afford him these rights denied the commission jurisdiction to decide his claim, a position that can be raised at any time.

A. APPOINTMENT OF COUNSEL TO PROSECUTE THE CLAIM

Devin first argues that his disability as an infant entitled him to the appointment of legal counsel to prosecute his claim. He cites no authority in support of that contention, and we have found none. Indeed, express statutory provision and

- 5 -

longstanding practice in this Commonwealth are to the contrary.

Code § 8.01-8 provides:

> Any minor entitled to sue may do so by his next friend.  Either or both parents may sue on behalf of a minor as his next friend.

This statute contains no provision either requiring or authorizing the appointment of legal counsel for a minor who sues by his next friend.

In Womble v. Gunter, 198 Va. 522, 95 S.E.2d 213 (1956), the Supreme Court said:

> Code § 8-87 [now § 8.01-8] authorizes an infant to sue by his next friend.  The practice in Virginia is for such suits to be instituted in the name of the infant by one of the parents or other near relative without formal appointment.  If the suit or action proceeds without objection, it is a recognition by the court that the infant is a party to the proceeding. . . . In numerous cases we have held that in absence of fraud an infant is as much bound by a decree or judgment of a court as is an adult.  The law recognizes no distinction between a decree against an infant and a decree against an adult, and, therefore, an infant can impeach it only upon grounds which would invalidate it in case of an adult party.

Id. at 530, 95 S.E.2d at 219.  The record in this case contains no evidence of fraud.  Rather, it reveals that the commission investigated and decided Devin's claim fairly and conscientiously.

The commission's failure to appoint legal counsel to prosecute Devin's petition did not deny it jurisdiction to decide his claim.

B.  FAILURE TO APPOINT A GUARDIAN AD LITEM

Devin next argues that the commission should have appointed a guardian ad litem to defend his interests.  Code § 8.01-9(A) provides, in pertinent part:

> A suit wherein a person under disability is a party defendant shall not be stayed because of such disability, but the court in which the suit is pending, or the clerk thereof, shall appoint a discreet and competent attorney-at-law as guardian ad litem to such defendant . . . and it shall be the duty of the court to see that the interest of the defendant is so represented and protected.

The statute specifically provides for the appointment of a guardian ad litem for an infant party defendant, not for an infant party plaintiff.  The Supreme Court considered this very question in Cook v. Radford Community Hospital, 260 Va. 443, 536 S.E.2d 906 (2000), and held:

> [Code § 8.01-9] is not concerned with the capacity of a person under a disability to sue but with the protection of such person when named as a defendant in a lawsuit.  One who institutes litigation is in a posture completely different than one against whom suit is filed.  The filing of a lawsuit is an affirmative act on the part of a plaintiff and does not carry with it the need for the type of court-initiated protection which may exist when a person with a disability is required to defend himself . . . .

Id. at 449, 536 S.E.2d at 909.

- 7 -

Devin relies on our decision in <u>Commonwealth ex. rel. Gray</u>

<u>v. Johnson</u>, 7 Va. App. 614, 376 S.E.2d 787 (1989), wherein we

said:

> The child . . . not adequately represented
> may not receive his or her day in court, and
> the fundamental due process right to be
> heard may be a abridged.
>
>     *       *       *       *       *       *       *
>
> The strong public policy of this
> Commonwealth posits that the paramount
> concern where children are concerned are
> their best interests. . . . The courts of
> the Commonwealth have a long history of
> protecting the interests of minor children
> and have expressed that careful concern by
> ensuring that the rights and interests of
> the minors are safeguarded.  Code §§ 8.01-9
> and 16.1-266 require that guardians ad litem
> or counsel be appointed to represent a
> child's interests when the child is involved
> in court proceedings.

<u>Id.</u> at 623, 376 S.E.2d at 791-92.  This statement in <u>Johnson</u> was

dictum.  <u>Johnson</u> turned not on whether a guardian <u>ad</u> <u>litem</u>

should have been appointed, but rather on whether a child whose

interests were affected had been made a party to the proceeding.

The quoted passage from <u>Johnson</u> relied upon <u>Moses v. Akers</u>, 203

Va. 130, 122 S.E.2d 864 (1961), and <u>Kanter v. Holland</u>, 154 Va.

120, 152 S.E. 328 (1930).  Those cases turned on the failure to

appoint guardians <u>ad</u> <u>litem</u> for infant defendants against whom

judgment had been rendered.  Both cases were decided in the

context of former Code § 8-88, which required appointment of a

guardian <u>ad</u> <u>litem</u> for an infant who "is a party."  The present

- 8 -

statute provides only for the appointment of a guardian ad litem for an infant who "is a party defendant."

The commission's failure to appoint a guardian ad litem to protect Devin's interests did not deny it jurisdiction to decide his claim.

## C.   DUE PROCESS

Devin has identified no failure by the commission to comply with the requirements of the Act.  He notes that his mother and next friend did not pursue all avenues of discovery that might have been available and might have been pursued by professional counsel.  However, he has demonstrated no fraud or unfairness and no failure of the commission to consider his claim fully and fairly.  In short, he has not demonstrated that the proceedings before the commission failed to comply with the established law of the Commonwealth or failed to afford him a fair disposition of his claim.  He has demonstrated no denial of due process.

We hold that the commission properly afforded Devin his procedural rights under the Act and that it had jurisdiction to decide his claim.

## III.   REBUTTAL OF THE CODE § 38.2-5008(A)(1) PRESUMPTION

### A.   THE PRESUMPTION

The Act[1] provides monetary relief to claimants who have sustained a "[b]irth-related neurological injury," which is defined as

> injury to the brain or spinal cord of an infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital which renders the infant permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled . . . [and which] disability [causes] the infant to be permanently in need of assistance in all activities of daily living.

Code § 38.2-5001.  Recognizing the difficulty in proving when such an injury was sustained, the legislature enacted a presumption to assist potential claimants in obtaining benefits. Code § 38.2-5008(A)(1) provides, in pertinent part, as follows:

> A rebuttable presumption shall arise that the injury alleged is a birth-related neurological injury where it has been demonstrated, to the satisfaction of the Virginia Workers' Compensation Commission, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury, and that the infant was thereby rendered permanently motorically disabled . . . .
>
>     If either party disagrees with such presumption, that party shall have the

---

[1] Birth-Related Neurological Injury Compensation Act, Code § 38.2-5000, et seq.

> burden of proving that the injuries alleged
> are not birth-related neurological injuries
> within the meaning of the chapter.

This is a "Morgan theory" presumption, which shifts "'both the burden of production and the burden of persuasion on the factual issue in question to the party against whom the presumption operates.'" Virginia Birth-Related Neurological Injury Compensation Program v. Young, 34 Va. App. 306, 311, 541 S.E.2d 298, 301 (2001).

Questions regarding the application of this type of presumption frequently arise concerning claims for benefits under Code § 65.2-402 of the Workers' Compensation Act. That code section provides, inter alia, that respiratory diseases suffered by firefighters, and hypertension or heart diseases suffered by firefighters and certain law enforcement personnel,

> shall be presumed to be occupational
> diseases, suffered in the line of duty, that
> are covered by [the Workers' Compensation
> Act] unless such presumption is overcome by
> a preponderance of competent evidence to the
> contrary.

Code § 65.2-402(A),(B). Addressing this presumption in the workers' compensation context, the Supreme Court has held that an employer seeking to overcome the presumption must

> show, by a preponderance of the evidence,
> both that 1) the claimant's disease was not
> caused by his employment, and 2) there was a
> non-work-related cause of the disease. . . .
> [I]f the employer does not prove by a
> preponderance of the evidence both parts of
> this two-part test, the employer has failed
> to overcome the statutory presumption.

- 11 -

Bass v. City of Richmond Police Dep't, 258 Va. 103, 114, 515 S.E.2d 557, 562-63 (1999). Evidence that a claimant's disease was not caused by his employment, suggesting by inference that the disease must, therefore, have had a non-work-related cause, is insufficient to prove the second prong of the test.

> The obvious purpose of the rebuttable presumption is to establish by law, in the absence of evidence, a causal connection between death or disability from certain diseases and the occupation of a firefighter. The effect of the presumption is to eliminate the necessity for proof by the claimant of causal connection. . . . In the absence of evidence, the statutory presumption prevails and controls. The presumption shifts the burden of going forward with the evidence from the claimant to his employer.
>
> Even if the negative finding . . . of no evidence of causal connection is equated arguendo with an affirmative finding that there was no causal connection, the rebuttal evidence is still insufficient. We hold that to rebut the statutory presumption the employer must adduce competent medical evidence of a non-work-related cause of the disabling disease, and there is no such evidence in the record before us.

Page v. City of Richmond, 218 Va. 844, 847-48, 241 S.E.2d 775, 777 (1978). See also Fairfax County Fire & Rescue Services v. Newman, 222 Va. 535, 538-39, 281 S.E.2d 897, 899-900 (1981). The employer must identify one or more specific non-work-related causes of the subject injury.

The Code § 38.2-5008(A)(1) presumption is stated in essentially the same terms as the Code § 65.2-402(A), (B)

- 12 -

presumption. It serves the same purpose, to provide a claimant a vehicle for recovery upon a prima facie showing of condition, casting upon the party resisting recovery the burden of proving non-entitlement. Therefore, we will apply with respect to the Code § 38.2-5008(A)(1) presumption the test adopted by the Supreme Court for application of the Code § 65.2-402(A), (B) presumption. Thus, we hold that to defeat the Code § 38.2-5008(A)(1) presumption, the Program must prove, to a reasonable degree of medical certainty, see Augusta County Sheriff's Dep't v. Overbey, 254 Va. 522, 527, 492 S.E.2d 631, 634 (1997), both (1) that the claimant's brain or spinal cord injury did not occur "in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital" and (2) that there was a specific, non-birth-related cause of the injury.

The Program concedes that the Code § 38.2-5008(A)(1) presumption applies in this case. Thus, to avoid liability, the Program bore the burden of proving by the preponderance of the evidence, to a reasonable degree of medical certainty, both (1) that Devin's brain or spinal cord injury did not occur "in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital" and (2) that a specific, non-birth-related cause produced the injury.

## B.   THE EVIDENCE

The medical evidence consists of the opinions of Dr. Duncan C. MacIvor, an obstetrician; Dr. Lawrence D. Morton, a pediatric neurologist; and a panel of three obstetricians specializing in high risk obstetrics, Dr. James E. Ferguson, Dr. Giancarlo Mari, and Dr. William N.P. Herbert, appointed pursuant to Code § 38.2-5008(B).

Dr. MacIvor concluded as follows:

> Devin's delivery was technically difficult with evidence of transient deprivation of oxygen.  His later neurological development, however, seems more consistent with unrelated degenerative neurological disease, and it is noteworthy that several pediatric neurologists . . . who have followed Devin for extended periods have been aware of his difficult birth yet have never inferred a causal relationship to his present condition.

> *     *     *     *     *     *     *

> All his neurologists have seemed well acquainted with his history.  Although there is occasional confusion in the later records over details of his perinatal history, none of the neurologists has made any connection between Devin's difficult delivery and his current status.  His seizure disorder has been attributed to infantile spasms, possible tuberous sclerosis, and to rare and subtle metabolic derangements.  None of these has ever been proven, and the records often state that the etiology of his problem is simply unknown.  Conspicuously absent in the neonatal and neurologic records are references to intracranial hemorrhage or hypoxic ischemic encephalopathy such as would be expected if the neurologic deficits were due to obstetric mechanical injury or significant deprivation of oxygen.  A baby

- 14 -

that was injured at birth should not have had a several week interval of apparently normal function and development only to deteriorate later, and the initial findings in the newborn nursery should have been more striking.

It is understandably tempting for concerned lay people . . . who experienced and witnessed Devin's difficult delivery, to link his birth with his current status. In my own opinion, the two simply do not fit together. It might be useful to have these records reviewed by an independent pediatric neurologist -- specifically addressing the question whether either birth trauma or oxygen deprivation could possibly have produced the picture that developed in Devin's early infancy. My own feeling is that no link exists, despite the clearly difficult delivery and undeniable (though brief) deprivation of oxygen, and that unfortunately, Devin does not qualify for the Program.

Dr. Morton reported his review of Devin's birth and medical records and concluded as follows:

In summary, while there was some evidence of the infant being depressed and some degree of hypoxia with depressed one minute APGARs, this was not sustained. The chart information provided does not exclude the possibility of this being causal in the child's development, but certainly does not allow me to say this is the most likely cause and in fact, another underlying process is suggested by some of the notes in the chart. The seeming prosperity early goes against a marked injury occurring at the time of birth.

Drs. Ferguson, Mari and Herbert reported as follows:

In carefully reviewing the clinical case involving this child in light of the Virginia Birth-Related Neurological Injury Compensation Act, it is our opinion that the

- 15 -

criteria for "birth-related neurological injury" are not met by the evidence presented in this case.

. . . [D]espite the difficult vaginal delivery, young Devin's prompt response to resuscitation and his early neonatal course are inconsistent with birth-related neurological injury.

[O]nly a small percentage of babies with cerebral palsy have [sic] as its origin events during the labor and delivery process. The majority have been thought to occur either early in the ante-natal or neonatal periods, and we feel that this young child's tragic situation falls into one of these other categories.

The deputy commissioner found that the foregoing evidence was credible and constituted a preponderance. The full commission agreed.

[W]hether the Program rebutted the presumption is a question to be determined by the commission as fact finder after weighing the evidence produced by both parties. . . . "On appeal from this determination, the reviewing court must assess whether there is credible evidence to support the commission's award."

Young, 34 Va. App. at 317, 541 S.E.2d at 304 (quoting Bass, 258 Va. at 114, 515 S.E.2d at 563).

Applying the two-part test we adopt for use in determining whether the Program has rebutted the Code § 38.2-5008(A)(1) presumption, we hold as a matter of law that the Program's evidence, though credible and preponderating, fails to rebut the presumption.

- 16 -

## 1. WHETHER THE INJURY OCCURRED IN THE COURSE OF LABOR, DELIVERY OR RESUSCITATION, ETC.

No physician concluded, to a reasonable degree of medical certainty, that Devin's injuries did not occur at birth. Dr. MacIvor opined that certain things "should" or "should not have" occurred had Devin's injuries been birth-related. He noted that several pediatric neurologists who had treated Devin and were aware of his difficult birth "[had] never inferred a causal relationship to his present condition." He stated his own "feeling" "that no link exists." None of these opinions was stated to a reasonable degree of medical certainty. Dr. MacIvor suggested reservation by concluding that "[i]t might be useful to have these records reviewed by an independent pediatric neurologist" regarding "whether either birth trauma or oxygen deprivation could possibly have produced" Devin's injuries.

The pediatric neurologist, Dr. Morton, reported that Devin's "seeming prosperity early goes against a marked injury occurring at the time of birth" and that the evidence did not allow him to say that the circumstances surrounding Devin's birth were the most likely cause of Devin's injuries, but he could not exclude the possibility that Devin's birth trauma was "causal in the child's development."

Finally, although the three-physician panel concluded that Devin's "prompt response to resuscitation and his early neonatal course are inconsistent with birth-related neurological injury,"

it did not state this opinion to a reasonable degree of medical certainty.  The panel's statement that it "feel[s] [Devin's] tragic situation" is not birth-related because "only a small percentage of babies with cerebral palsy have [sic] as its origin events during the labor and delivery process" and that "[t]he majority [of such injurious events] [are] thought to occur early in the ante-natal or neonatal periods" reinforces the conclusion that its opinion regarding "inconsisten[cy]" was not a finding, stated to a reasonable degree of medical certainty, that Devin's condition is not birth-related.

## 2.   WAS THERE A SPECIFIC, NON-BIRTH-RELATED CAUSE OF THE INJURY

Assuming arguendo that the evidence supports a finding that Devin's injuries did not occur at birth, it fails to prove, to a reasonable degree of medical certainty, a specific, non-birth-related cause.  Thus, it fails to rebut the Code § 38.2-5008(A)(1) presumption.  Dr. MacIvor identified no non-birth-related cause of Devin's condition.  He stated that Devin's "later neurological development . . . seems more consistent with unrelated degenerative neurological disease," but he did not state this opinion to a reasonable degree of medical certainty, and he noted that Devin had received numerous possible diagnoses, "[n]one of [which] has ever been proven." Dr. Morton did not identify, to a reasonable degree of medical certainty, a non-birth-related cause of Devin's condition.  He

- 18 -

stated that "another underlying process [rather than a birth-related injury,] is suggested by some of the notes in the chart," but he did not identify that "underlying process" and did not opine to a reasonable degree of medical certainty that it was a non-birth-related cause of Devin's condition.  Finally, the three-doctor panel gave no opinion regarding the specific cause of Devin's condition.  It stated only that it "[felt]" Devin's condition originated "either early in the ante-natal or neonatal periods."  It did not state this opinion to a reasonable degree of medical certainty.

The evidence failed, as a matter of law, to support the commission's holding that the Program had rebutted the Code § 38.2-5008(A)(1) presumption.  Thus, the presumption carried Devin's burden of proof, and he is entitled to an award of benefits under the Act.  We reverse and remand this case to the commission for entry of an appropriate award.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>